1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11  RICK G. CULVER,                )
                                   )
12              Plaintiff,         )
                                   )    No.  CV-05-1720-HU
13       v.                        )
                                   )
14  QWEST COMMUNICATIONS CORPORA-  )
    TION, a Delaware corporation,  )
15  QWEST CORPORATION, a Colorado  )
    corporation, QWEST COMMUNICA-  )
16  TIONS INTERNATIONAL, INC., a   )    FINDINGS & RECOMMENDATION
    Delaware corporation; and JOHN )
17  or JANE DOE;                   )
                                   )
18              Defendants.        )
    ───────────────────────────────)

19

    Thomas D. Bond
20  THOMAS D. BOND, P.C.
    4664 SE King Road
21  Milwaukie, Oregon 97222

22       Attorney for Plaintiff

23  David P.R. Symes
    Renee E. Starr
24  PERKINS COIE LLP
    1120 NW Couch Street, Tenth Floor
25  Portland, Oregon 97209-4128

26       Attorneys for Defendants

27  HUBEL, Magistrate Judge:

28       Plaintiff Rick Culver brings this action against his former

1 - FINDINGS & RECOMMENDATION

employer, Qwest[1], alleging that he was discriminated against because of his age or in retaliation for filing a workers' compensation claim.  Defendants move for summary judgment.  I recommend that the motion be granted.

BACKGROUND

Plaintiff worked for Qwest, and its predecessors, from 1978 until his termination on August 1, 2003.  Culver Depo. at pp. 7-8. He worked as a Network Technician as part of the "construction crew" with primary duties of splicing telephone cable to repair and maintain the physical aspects of the telephone company.  Id. at pp. 8, 14; Exh. 6 to Starr Oct. 13, 2006 Declr.

Plaintiff was based at defendant's Astoria garage.  Ingraham Depo. at p. 145.  He reported to Construction Supervisor Mike Ingraham.  Id. at p. 27.  Ingraham reported to Director of Network Operations Julie Galey.  Id.; Galey Depo. at pp. 19.

Plaintiff received a performance appraisal from Ingraham in August 2002.  Pltf's Exh. 10.  The appraisal was generally satisfactory.  Id.  However, Ingraham checked the box indicating that plaintiff "often has difficulty working with others due to inconsistent team effort."  Id.  He noted that plaintiff needed to "work on his attitude," although he also remarked that plaintiff "thinks of others at times."  Id.  In terms of his quality of work,

---

[1] Plaintiff named three separate Qwest corporate entities as defendants.  On October 13, 2006, the parties stipulated to the dismissal of Qwest Communications International, Inc. (dkt #51).  Two corporate entities remain as named defendants.  The motion is brought by all defendants but I refer to defendant in the singular because it appears that plaintiff was employed by only one of the two named corporations, but both remain in the case at this point.

Ingraham noted that plaintiff met the standards on most jobs, had few defects, but needed to attend "Basic Cable Splicing." Id.

On September 27, 2002, plaintiff was one of four technicians observed together on a coffee break. Culver Depo. at p. 192. Plaintiff, and one of the other three technicians, Gary Mayfield, worked on the same crew reporting to Ingraham. Id. at p. 194; Ingraham Depo. at p. 27; Exh. 9 to Starr Oct. 13, 2006 Declr. at p. 2. Ingraham orally reprimanded both plaintiff and Mayfield for violating company policy on breaks and lunches. Culver Depo. at p. 190, 192, 193; Exh. 9 to Starr Oct. 13, 2006 Declr. at p. 2. Plaintiff admits the other two technicians involved in the "coffee break" incident were on a different crew and were not covered by the same policy. Culver Depo. at pp. 193-94. As Culver explained, he and Mayfield were covered by the Northwest Territories Construction/Engineering Policies, but Bob Tierney and Russ Stewart were not, because "[t]hey were installation and maintenance crew, they were different." Id. at p. 193.

On both October 29, 2002, and October 30, 2002, Ingraham witnessed plaintiff at a local restaurant, Arnie's Café, for an extended break period. Exh. 10 to Starr Oct. 13, 2006 Declr. The restaurant was not on plaintiff's direct route, and the breaks exceeded the fifteen minutes plaintiff was allotted. Id.; Ingraham Depo. at p. 185. Plaintiff was suspended for 1½ days without pay for these violations of the break policy. Exh. 10 to Starr Oct. 13, 2006 Declr.

Plaintiff returned from the suspension on November 1, 2002, and met with Ingraham and Galey who gave him a written warning of dismissal for his conduct violations. Id. Plaintiff's union

3 - FINDINGS & RECOMMENDATION

representative Doug Iverson was present for the meeting.   Culver

Depo. at p. 199.    The written warning summarized his prior

discipline, including his past violations of the break policy, and

concluded:

> Your failure to meet the expectation of the "Written
> Warning" dated 9-9-2002 has now put your job in serious
> jeopardy.  This is considered disciplinary action.  You
> are not eligible to participate in the Upgrade and
> Transfer Plan.  If you fail to abide by this warning, or
> if you fall below a satisfactory level in any other areas
> of performance, you will face further disciplinary
> action, up to and including dismissal.  This document
> will remain a part of your employment history and the
> disciplinary action will be in effect for 24 months.

Exh. 10 to Starr Oct. 13, 2006 Declr. at p. 2.

Ingraham and Galey both signed the document.  _Id._  The place

for plaintiff's signature indicates that he refused to sign it.

_Id._

On June 27, 2003, about eight months after the November 1,

2002, written warning of dismissal, plaintiff's work assignment was

a cable splice project that included the 911 emergency circuit in

Seaside.  Culver Depo. at pp. 78-79.  His shift started at 7:00

a.m., in the Astoria garage.  Exh. 9 to Starr Oct. 13, 2006 Declr.

He drove to Seaside, and completed his first task between 12:30

p.m. and 1:00 p.m.  _Id._; Culver Depo. at p. 147.  Plaintiff then

took a thirty-minute lunch break at the Seaside Central office from

1:00 to 1:30 p.m.  Culver Depo. at p. 147.

Plaintiff then determined he did not have enough time to set

up an "aerial work operation," and at 1:30, he drove to Astoria.

_Id._ at pp. 147-48.  He decided to drive to the Astoria garage to

clean out his truck and restock it for the following week.  _Id._ at

p. 148.

4 - FINDINGS & RECOMMENDATION

1    Plaintiff drove into the Astoria garage, but did not stop
2  there, and instead drove several blocks away to the Astoria Central
3  Office to pick up his paycheck.  Culver Depo. at pp. 149, 170.
4  Plaintiff then drove to the Labor Temple Hall to see if a key he
5  had been given would open up a meeting room.  Exh. 9 to Starr Oct.
6  13, 2006 Declr.  Neither of these stops was work related.  Id.

7    During the time plaintiff was driving to the Central Office
8  and the union hall in Astoria, the splice work he had performed
9  that morning in Seaside had failed, causing an outage in 911
10  service in Seaside.  Id.; Culver Depo. at pp. 78-79.  Management
11  immediately tried to reach plaintiff.  Galey Depo. at p. 61;
12  Ingraham Depo. at pp. 146-47; Meisner Depo. at pp. 142-43.
13  Plaintiff was unreachable by pager and by cell phone.  Id.; Culver
14  Depo. at p. 140.  Plaintiff states that his pager was inoperable
15  because of Mike Meisner's failure to update a telephone number.
16  Id.  His cell phone was charging on the dash of his truck.  Culver
17  Depo. at pp. 142-43.

18    Culver was finally spotted by Sean McDonnell, Installation &
19  Maintenance Manager, at about 2:30 p.m. when he was leaving the
20  Labor Temple Hall.  Exh. 9 to Starr Oct. 13, 2006 Declr.  He was
21  informed about the problem with the 911 service and that it was in
22  his splice.  Id. McDonnell sent plaintiff back to Seaside to help
23  other technicians working on the outage.  Id.  Plaintiff did not
24  arrive in Seaside until 3:05 p.m., and the repair was already
25  complete.  Culver Depo. at p. 178.  He assisted in the clean up and
26  then returned to the Astoria garage.  Culver Depo. at pp. 184-85.

27    Plaintiff's time for that day was recorded as nine hours to a
28  single job code for splicing work in Seaside, consisting of one

5 - FINDINGS & RECOMMENDATION

1   hour of overtime, and eight hours of regular time. Culver Depo. at

2   210-11; Exh. 11 to Starr Oct. 13, 2006 Declr. Culver makes a point

3   of stating, repeatedly, that he himself did not fill out his

4   timesheet for the day at issue. Culver Depo. at p. 374. Rather,

5   he states that Meisner entered the time on that time sheet for June

6   27, 2003. Id. But, plaintiff testified in deposition that

7   plaintiff himself gave Meisner the information about the hours

8   plaintiff worked that day. Id. at p. 378. He stated that Meisner

9   asked him how many hours he worked that day and "so I told him nine

10  hours to the job; eight regular, one overtime." Id.

11      The date at issue, June 27, 2003, was a Friday. The following

12  Monday, plaintiff was questioned regarding the 911 outage and his

13  whereabouts on June 27, 2003. Exh. 16 to Starr Oct. 13, 2006

14  Declr.[2] Plaintiff, Ingraham, Mike Matney, and union representative

15  John Cerkan attended the meeting. Id. Ingraham asked plaintiff

16  about the work he performed on June 27, 2003, in Seaside. Id.

17  They discussed some technical aspects of the work and then

18  plaintiff explained that he drove to Astoria to the Central Office

19  to pick up his mail and to the Labor Temple Hall to see if a key

20  would open up a room. Id. He was asked why he had his mail

21  delivered to the central office and why he believed it was okay to

22  pick up his mail on company time. Id. He responded that he

23  believed it was "safer" and that it was okay to pick it up on

24  company time. Id. He was then told that if his job site was

25  Seaside, he was out of route. Id. Plaintiff's response was that

26

27      [2] This exhibit appears to be the typewritten notes of the
    June 30, 2007 meeting, including what appear to be some quotes
28  from the participants.

6 - FINDINGS & RECOMMENDATION

"they have done it forever at the coast." Id.  Plaintiff also agreed that instead of returning to Astoria, he should have stayed in Seaside and worked longer in Seaside.  Id.

Sometime between June 27, 2003, and August 1, 2003, Galey reviewed plaintiff's timesheet for June 27, 2003.  Galey Depo. at p. 107.  She concluded that the timesheet was fraudulent because plaintiff reported nine hours of work and he did not work nine hours.  Id.  She explained:

> [Plaintiff] reported nine hours of time worked, which is an hour overtime.  After the 911 outage, we could not find Mr. Culver.  We later learned that he had driven from Seaside to Astoria to pick up his mail, which is not allowed on company time, and which takes a while to get to Astoria, and he was not answering any of his calls, and yet he still reported overtime.  He was not on the job.

Galey Depo. at p. 77.

After concluding that plaintiff had inaccurately reported his work activities and time for June 27, 2003, Galey reviewed the pertinent provisions of the Code of Conduct, including the provision entitled "Safeguard Our Employees and Our Assets." Galey Depo. at pp. 168-70; Exh. 15 to Starr Oct. 13, 2006 Declr.  Galey also consulted with Ingraham, Vice President Randy Hagedorn, and labor relations representatives Sharlene Ayabe and Mike Lynch. Galey Depo. at pp. 55-56.

Galey decided to terminate plaintiff's employment.  Galey Depo. at p. 140.  Galey stated that "disciplinary action that was taken over a period of time," was a cause that led up to this final incident and that "[t]he reason for the actual termination was safeguarding our employees and our assets or fraudulent time reporting." Id.

7 - FINDINGS & RECOMMENDATION

1    Plaintiff states that Ingraham was a joint decision-maker with
2    Galey in making the termination decision.   The evidence in the
3    record, however, is equivocal on this issue.   Ingraham stated that
4    the termination decision was a "corporate decision."   Ingraham
5    Depo. at p. 66.   He was asked if he was referring to a decision-
6    maker on behalf of the corporation when he said "corporate
7    decision."   Id.   He answered, yes, and indicated that the decision-
8    maker was Galey.   Id.

9    Ingraham then testified that the role of labor relations in
10   the termination process was to make sure all of the guidelines had
11   been followed and he was unsure if labor relations had a "vote," as
12   to whether an employee should be terminated.   Id.   In response to
13   the question of whether he recommended Culver's termination to
14   anyone, Ingraham stated "[t]hat was a joint collaboration."   Id.
15   At a different point in his deposition, Ingraham stated in response
16   to the question of whether he recommended plaintiff's termination,
17   that "[t]hat was a joint decision."   Ingraham Depo. at p. 61.   In
18   response to the question of who was involved with the joint
19   decision, he stated himself, Galey, human resources, and Randy
20   Hagedorn.   Id.

21   Galey testified that she discussed the matter with others, but
22   that she was the sole decision-maker.   Galey Depo. at pp. 47-48.
23   When asked point blank, who made the decision to terminate
24   plaintiff, she stated "I did."   Galey Depo. at p. 48 (Exh. 5 to
25   Bond Declr.).   She stated that no one else was involved in the
26   termination decision-making process, but she explained that she did
27   run her decision by Hagedorn.   Id.   It also appears that labor
28   relations advised Galey as to whether her decision to terminate

8 - FINDINGS & RECOMMENDATION

1  would be upheld under the "just cause" termination standard of the

2  collective bargaining agreement.  Ayabe Depo. at p. 37 (Exh. 17 to

3  Bond Declr.) (stating that Galey was the decision-maker, that human

4  resources and labor relations were not part of the decision-making

5  process, but were consulted on the just cause question).

6      Galey and Ingraham met with plaintiff on August 1, 2003, to

7  inform him that he was being terminated.  Galey Depo. at p. 124.

8  A  written  letter  to  plaintiff,  or  perhaps  a  memorandum

9  memorializing the August 1, 2003 termination meeting, stated that

10 based on the investigation results of the June 27, 2003 incident,

11 plaintiff was terminated effective August 1, 2003.  Exh. 9 to Starr

12 Oct. 13, 2006 Declr.

13     Plaintiff grieved his termination pursuant to the applicable

14 collective  bargaining  agreement  and  the  grievance  went  to

15 arbitration.  Culver Depo. at p. 316; Exh. 14 to Starr Oct. 13,

16 2006 Declr.  The arbitrator concluded that discipline for the

17 events of June 27, 2003, was warranted because plaintiff "misused

18 Company assets in that he was non-productive for at least 1½ hours;

19 he incorrectly completed his time card for that day; and he was out

20 of Company reach from approximately noon to 2:29 p.m. on that day."

21 Exh. 14 to Starr Oct. 13, 2006 Declr.  The arbitrator also

22 concluded that although plaintiff's twenty-three year good work

23 history was a mitigating consideration, he had sufficient notice

24 that his future with the company was in jeopardy and he was "far

25 along in the chain of progressive discipline[.]"  Id.

26     A.  Additional Facts Pertinent to Age Discrimination Claim

27     Plaintiff notes that at the post-termination arbitration

28 hearing, Ingraham stated that plaintiff should "lead by example,"

9 - FINDINGS & RECOMMENDATION

and that Qwest was  a "faster company now." Culver Depo. at pp.
116-17.  However, plaintiff admits that at the hearing, Ingraham
never used words or phrases such as"older employee" or "older
worker" or "anything like that[.]"  Culver Depo. at p. 119.

Plaintiff understood the "lead by example" comment to mean
that plaintiff, as an older worker, should lead the younger workers
and help them.  Culver Depo. at p. 117.  He understood the "faster
company now" comment as meaning that now that plaintiff, as the
slow guy, was gone, Qwest was a faster company now.  Id.

Plaintiff contends that Ingraham made comments in spring and
early summer 2002, more than one year before his termination and
approximately one year before June 27, 2003, about plaintiff being
the "old man," the "old man of the crew," and "old school," in
front of a crew.  Culver Depo. at p. 115.  He contends that the
crew then started using those terms.  Id.  The total number of
times such comments were made are alleged to be "[m]aybe half a
dozen[.]"  Id.  He states that Ingraham "initiated them, but then
the other crew members started repeating them occasionally in
jest."  Id.

B.  Additional  Facts  Pertinent  to  Workers'  Comp
    Discrimination Claim

On September 19, 2002, plaintiff suffered a one-inch cut to
his right hand while working.  Culver Depo. at p. 96.  The
accident/investigation report completed by plaintiff is dated both
September 24, 2002, and September 25, 2002. Exh. 7 to Starr Oct.
13, 2006 Declr.  It is unclear exactly when plaintiff sought
treatment for the cut, but it does not seem to be disputed that
swelling did not begin until several days after the injury.  Culver

Depo. at pp. 96-99.  He was treated with some antibiotics and released to return to work without restrictions.  Culver Depo. 96-99.

Page two of the accident investigation report has a section entitled "action plan," in which plaintiff proposed for himself that he "[s]low down[,] take more time to complete work operation[; and] be more cautious[.]"  Exh. 7 to Starr Oct. 13, 2006 Declr. at p. 2.  Plaintiff filled out the form in consultation with Ingraham, but plaintiff admitted that he proposed the comments in this section, and Ingraham indicated they were fine.  Culver Depo. at p. 100-01.

No one made any derogatory comments about plaintiff's workers' compensation injury during his employment.  Culver Depo. at p. 91. He made no complaint during his employment of any ill treatment or retaliation for having filed this workers' compensation claim. Culver Depo. at p. 61.  Galey had no knowledge of plaintiff's workers' compensation claim.  Galey Depo. at p. 91.

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the

absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Id.; In re Agricultural Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990); California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

DISCUSSION

Plaintiff's claims are brought under state law.  The age discrimination claim is brought pursuant to Oregon Revised Statute § (O.R.S.) 659A.030 and the workers' compensation discrimination claim is brought under O.R.S. 659A.040.  In federal court,

12 - FINDINGS & RECOMMENDATION

employment discrimination claims brought pursuant to an Oregon statute are analyzed on summary judgment by using the familiar three-part burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Snead v. Metropolitan Prop. & Cas. Ins. Co.</u>, 237 F.3d 1080, 1091-93 (9th Cir. 2001) (applying federal <u>McDonnell-Douglas</u> burden-shifting standard to state employment discrimination claims when jurisdiction is based on diversity); <u>Granville v. City of Portland</u>, Nos. CV-02-1016-HA, CV-04-1295-HA, 2005 WL 1113841, at *3 (D. Or. May 10, 2005) (citing <u>Henderson v. Jantzen, Inc.</u>, 79 Or. App. 654, 719 P.2d 1322 (1986) for proposition that <u>McDonnell Douglas</u> prima facie case requirements apply to Oregon statutory discrimination claims).

The burden-shifting framework requires the plaintiff to first establish a prima facie case of unlawful discrimination followed by the defendant articulating a legitimate, nondiscriminatory reason for its action.  <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1122 n.16 (9th Cir. 2004).  If the defendant does so, the plaintiff must show that the articulated reason is a pretext for discrimination. <u>Id.</u>; <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 658-59 (9th Cir. 2002).

Standards used to analyze federal discrimination claims apply to Oregon employment discrimination claims.  <u>E.g.</u>, <u>Conley v. City of Lincoln City</u>, CV-02-216-AS, 2004 WL 948427, at *3 (D. Or. Apr. 20, 2004) (citing cases for the proposition that Oregon courts consistently hold that case law developed by federal courts is used to interpret Chapter 659).

I.   Prima Facie Case

To establish a prima facie case of age discrimination,

13 - FINDINGS & RECOMMENDATION

plaintiff must show that:  (1) he is a member of a protected class; (2) he was performing his job in a satisfactory manner; (3) he was denied a term, condition, or benefit of employment; and (4) similarly situated employees who are not members of the protected class were treated more favorably in this regard.  Scott v. Sears, Roebuck & Co., 395 F. Supp. 2d 961, 973 (D. Or. 2005) (citing McDonnell Douglas, 411 U.S. at 802).  "In a claim alleging discharge on the basis of age, the fourth element is sometimes stated as requiring evidence that the plaintiff was 'replaced by a substantially younger employee with equal or inferior qualifications.'"  Id. (quoting Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1997)).

The amount of evidence required to make out a prima facie case is very little, and need not even rise to the level of a preponderance of the evidence.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 888 (9th Cir. 1994).

Defendant contends that plaintiff cannot meet the second requirement of demonstrating that he was satisfactorily performing his job.  Defendant relies on the fact, as detailed above, that plaintiff was on a warning of dismissal for prior employer policy violations at the time of his discharge.

In a discriminatory discharge case, the plaintiff must show "he was performing his job well enough to rule out the possibility that he was fired for inadequate job performance[.]"  Pejic v. Hughes Helicopters, Inc., 840 F.2d 667, 672 (9th Cir. 1988); see also Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 n.8 (9th Cir. 2002) (remarking that it was uncertain if the plaintiff had satisfied her burden on the satisfactory performance element of

14 - FINDINGS & RECOMMENDATION

the prima facie case, even with the low threshold of evidence required to do so, because of the plaintiff's failure to follow a particular safety procedure).

In a 2004 case, Judge King granted summary judgment against a plaintiff who had brought both age and sex discrimination claims under federal and state law, based on his conclusion that the plaintiff had failed to show, as part of his prima facie case, that he was performing his job satisfactorily. Spees v. Willamina Sch. Dist. 30J, No. CV-03-1425-KI, 2004 WL 2370642, at *6 (D. Or. Oct. 19, 2004).

The Spees plaintiff was a twenty-six year teacher who argued that isolated instances of discipline were inadequate to show that he was not performing his job satisfactorily. Id. Judge King rejected this argument:

> I must agree with the District. There is evidence that many parents would not allow their children to be in Spees' class. His file contains several disciplinary letters and several other yearly evaluations which admonish Spees for his methods of discipline and interaction with the students. The last straw was when the [Teacher Standards & Practices Commission] suspended Spees' license for 90 days because of misconduct. Spees' termination followed shortly thereafter. There is also no direct evidence of discrimination. I am mindful that the prima facie case is a very low hurdle for a plaintiff and is frequently conceded by a defendant. On this evidentiary record, however, I conclude that Spees has not raised a factual issue that he was performing his job satisfactorily and thus, has failed to establish a prima facie case.

Id.

Here, plaintiff contends that because defendant bases its termination on plaintiff's falsification of his timesheet for June 27, 2003, and the evidence is that plaintiff himself did not fill out his timesheet for that date, there is nothing unsatisfactory

15 - FINDINGS & RECOMMENDATION

about his performance.  He complains that before his termination,
he was never given the opportunity to explain that Meisner, not
plaintiff, filled out his timesheet for June 27, 2003.  Plaintiff
also notes that although he had been disciplined before June 27,
2003, he still had his job and was working full-time on June 27,
2003.

Plaintiff's arguments are without merit.  First, as noted in
the factual recitation above, while Meisner may have been the
scrivener, the information provided to him for plaintiff's June 27,
2003 timesheet, came from plaintiff and thus, there is simply no
significance to the fact that plaintiff himself did not fill out
the timesheet.

Second, the question is not whether the incident which
allegedly triggered the termination establishes whether plaintiff
was performing his job satisfactorily or unsatisfactorily at the
time of that incident.  The question is whether the incident
occurred against the backdrop of previously documented poor or
unsatisfactory performance.

Although plaintiff had received satisfactory job performance
evaluations in the past, with the most recent before the
termination occurring in August 2002, it is undisputed that these
evaluations preceded the written warning of dismissal which was
effective November 1, 2002, and which made clear that plaintiff's
job was in serious jeopardy for the following twenty-four months.
On June 27, 2003, the November 1, 2002 written dismissal warning
was in effect.

I agree with defendants that plaintiff fails to show, even
with the low threshold required, that as of June 27, 2003, he was

16 - FINDINGS & RECOMMENDATION

satisfactorily performing his job.  As in <u>Spees</u>, plaintiff here was a long-time employee, but one with a history of discipline.  At the time of his dismissal and the triggering incident, he was under a written warning of dismissal.  Plaintiff fails to establish a prima facie case of discrimination.  Even if plaintiff established his prima facie case, however, I still recommend granting summary judgment on the basis that he fails to demonstrate pretext.

II.  Legitimate, Nondiscriminatory Reason

There is no serious dispute that defendant here articulates a legitimate, nondiscriminatory reason for terminating plaintiff: he reported nine hours of work for June 27, 2003, when defendant concluded he did not work nine hours on that date.  <u>See</u> <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981) ("[T]he employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons.") (internal quotation omitted).

III.  Pretext

Plaintiff can establish pretext in two ways:  "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  <u>Chuang v. University of Ca. Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1127 (9th Cir. 2000).  Plaintiff does not need to prove both at summary judgment.  To survive summary judgment, plaintiff is not required to provide direct evidence of discriminatory intent as long as a reasonable factfinder could conclude, based on plaintiff's prima facie case and the factfinder's disbelief of defendant's reasons

17 - FINDINGS & RECOMMENDATION

1  for  discharge,  that  discrimination  was  the  real  reason  for

2  defendant's actions.  Nidds, 113 F.3d at 918 n.2.

3      Additionally, plaintiff does not have to introduce additional,

4  independent  evidence  of  discrimination  at  the  pretext  stage.

5  Chuang, 225 F.3d at 1127.  Rather, "a disparate treatment plaintiff

6  can  survive  summary  judgment  without  producing  any  evidence  of

7  discrimination  beyond  that  constituting  his  prima  facie  case,  if

8  that evidence raises a genuine issue of material fact regarding the

9  truth of the employer's proffered reasons."  Id.

10     A  plaintiff  is  required  to  produce  "very  little"  direct

11 evidence  of  an  employer's  discriminatory  intent  to  move  past

12 summary judgment.  Id. at 1128.  Direct evidence of discrimination

13 is "evidence, which, if believed, proves the fact of discriminatory

14 animus  without  inference  or  presumption."  Godwin v. Hunt Wesson,

15 Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotation and

16 brackets  omitted).   Alternatively,  the  plaintiff  may  come  forward

17 with circumstantial evidence that the employer's proffered reasons

18 were  pretextual,  but  such  circumstantial  evidence  must  be

19 "specific" and "substantial" to create a triable issue of fact as

20 to whether the employer intended to discriminate.  Id. at 1222.[3]

21     Circumstantial  evidence  "can  take  two  forms."  Coghlan v.

22

23

24     [3]  But see Cornwell v. Electra Cent. Credit Un., 439 F.3d
   1018, 1030-31 (9th Cir. 2006) (discussing whether post-Godwin
25 cases may have overturned the Godwin requirement that a
   plaintiff's circumstantial evidence of pretext must be "specific
26 and "substantial," but not finally deciding the issue because the
   evidence presented by the plaintiff was sufficient to create a
27 genuine issue of fact regarding the defendant's motive for its
   actions under the Godwin specific and substantial standard in any
28 event).

18 - FINDINGS & RECOMMENDATION

1   American Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005).

2   The plaintiff can make an affirmative case that the employer is

3   biased by relying on statistical evidence. Id. Or, "the plaintiff

4   can make his case negatively, by showing the employer's proffered

5   explanation for the adverse action is 'unworthy of credence.'" Id.

6   (quoting Burdine, 450 U.S. at 256). As the Supreme Court explained

7   in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147

8   (2000), "[p]roof that the defendant's explanation is unworthy of

9   credence is simply one form of circumstantial evidence that is

10  probative of intentional discrimination, and it may be quite

11  persuasive." Moreover, "a plaintiff's prima facie case, combined

12  with sufficient evidence to find that the employer's asserted

13  justification is false, may permit the trier of fact to conclude

14  that the employer unlawfully discriminated." Id. at 148.[4]

15      Plaintiff raises several pretext arguments which I discuss in

16  turn.

17      A.  Shifting Reasons for Termination

18      As noted above, in deposition, Galey stated that the basis for

19  plaintiff's termination "was safeguarding our employees and our

20

21      [4] Although cases support defendant's argument that because
    of the neutral arbitrator's decision in defendant's favor,
22  plaintiff faces an even higher burden of establishing evidence of
    pretext, Collins v. New York City Transit Auth., 305 F.3d 113,
23  118-19 (2d Cir. 2002) (to survive motion for summary judgment,
    Title VII plaintiff must present strong evidence that employer's
24  decision was wrong when a decision adverse to plaintiff has been
    rendered by an independent tribunal); Smith v. United Parcel
25  Serv., No. C 03-04646 CRB, 2006 WL 733467, at *3 (N.D. Cal. Mar.
    22, 2006) (arbitrator's decision in employer's favor "raises the
26  bar plaintiff must hurdle to show that the termination was a
    pretext for race discrimination"), I need not apply that higher
27  burden in this case because even without a higher threshold,
    plaintiff fails to establish pretext.
28

19 - FINDINGS & RECOMMENDATION

assets or fraudulent time reporting."  Galey Depo. at p. 140.

Plaintiff argues that contradictory reasons offered by two other employees of defendant after his termination show that defendant's articulated reason is a pretext for discrimination. I disagree.

First, in a December 9, 2003 written response to plaintiff's union grievance from Labor Relations Manager Sharlene Ayabe to Communication Workers of American Staff Representative Linda Rasmussen, Ayabe first stated that "[t]he issue that gives rise to this grievance is the termination of Rick Culver on August 1, 2003, for violation of Qwest Code of Conduct, specifically 'Safeguard Our Employees and Our Assets'/misuse of company time." Exh. 16 to Bond Oct. 23, 2006 Declr.  After reciting the events of the day on June 27, 2003, and noting plaintiff's past history of discipline, Ayabe noted in her concluding remarks that "Mr. Culver was found in violation of Qwest Code of Conduct for misuse of company time for the incident of June 2[7][5], 2003 and was subsequently dismissed on August 1, 2003." Id.

Second, in a September 27, 2004 letter written by defendant's EEO Dispute Resolution Manager Mark Berumen to an investigator for the Oregon Bureau of Labor and Industries (BOLI), Berumen stated that plaintiff was terminated as a result of "falsification of his time sheet.  Nothing more, nothing less." Exh. 1 to Bond Oct. 23, 2006 Declr.

Plaintiff notes that Ayabe acknowledged, in response to

---

[5]  There is no dispute that the original letter contains a typographical error in the date.

20 - FINDINGS & RECOMMENDATION

questioning from plaintiff's counsel in her deposition, that the reason Berumen asserted for the termination (falsifying time sheets) appears different than the reason she gave (misuse of company assets). Exh. 18 to Bond Oct. 23, 2006 Declr. (Ayabe Depo. at p. 110). She did note that they are still both code of conduct violations. Id.

Plaintiff sees some significance in the fact that in the termination letter, Galey stated that plaintiff violated "Qwest Code of Conduct, specifically 'Safeguard Our Employees and Our Assets[,]'" Exh. 9 to Starr Oct. 6, 2006 Declr., while Berumen, some thirteen months after the termination in a letter to BOLI, stated that plaintiff was terminated for falsifying his time sheet, which, according to plaintiff, is different than the "safeguarding our assets" violation.

An employer's shifting explanations for its actions may give rise to an inference of pretext. E.g., Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993) ("fundamentally different justifications" for an employer's action give rise to a genuine issue of fact with respect to pretext). However, when the reasons articulated by the employer are not incompatible, they are not considered sufficiently "shifting" to suggest pretext. Nidds, 113 F.3d at 918 ("the reasons given by [the employer] are not incompatible, and therefore not properly described as 'shifting reasons.'").

Even considering the evidence in a light most favorable to plaintiff, defendant's reasons in this case have not shifted. There is no question that Galey, Ayabe, and Berumen all articulated that the basis for the termination was plaintiff's actions on June

21 - FINDINGS & RECOMMENDATION

27, 2003, of driving back to Astoria and checking his mail at the central office and going to the union hall, and essentially, performing non-company tasks and then claiming that he spent nine hours working on that date. The essence of the problem was that he was not on company time when he should have been, and then filled out his timesheet as if he had been on company time the entire day. The timesheet for June 27, 2003, showing nine hours of work in Seaside for that day, was inaccurate. Defendant has never varied from its position that those actions were the basis for the discharge.

Galey was asked in her deposition whether she agreed with Berumen's statement in his September 2004 letter that plaintiff was terminated for falsification of his time sheet, nothing more, nothing less. Exh. 3 to Bond Oct. 23, 2006 Declr. (Galey Depo. at p. 153). She replied:

> You know, I think -- I think we're really into semantics here as far as falsification, fraudulent time recording, misuse of company time. To me, they're all the same. So I just want to make sure I clarify when we're talking about that, we're all talking about the same thing. I am. That's my understanding.
>
> Was he -- he terminated based on fraudulent time recording, misuse of company time or falsification of his time sheet. To me, that's all the same thing. Yes, I agree with that.

Id.

The reason has remained the same from the termination letter through the litigation, even if the words used by the various deposed employees to describe the basis for the termination have varied somewhat. As a matter of law, I conclude that defendant has not articulated inconsistent or fundamentally different reasons for its termination of plaintiff and thus, plaintiff fails to create an

1    issue of pretext with this evidence.

2        B.  Comments by Ingraham

3        As noted above, Ingraham made comments, more than one year

4    before plaintiff's discharge, about plaintiff being the "old man,"

5    the "old man of the crew," and "old school."  Culver Depo. at p.

6    115.  He contends that the crew then started using those terms.

7    Id.  The total number of times such comments were made, by Ingraham

8    and the crew, are alleged to be "[m]aybe half a dozen[.]"  Id.

9        Plaintiff argues that these comments are evidence of pretext

10   because they demonstrate that Ingraham is biased against plaintiff

11   because of plaintiff's age.  He also adds that Ingraham made two

12   comments at the post-termination arbitration hearing which further

13   demonstrate Ingraham's bias.  Those comments were that Qwest is a

14   faster company now and that plaintiff had to lead by example.

15       Putting aside the issue of whether Ingraham was a joint

16   decision-maker in the termination, and assuming for the purposes of

17   this motion that he was, the comments do not create an issue of

18   fact on pretext.

19       First, under Godwin and earlier cases, direct evidence of

20   discrimination is "evidence, which, if believed, proves the fact of

21   discriminatory animus without inference or presumption."  Godwin,

22   150 F.3d at 1221 (internal quotation and brackets omitted).  Here,

23   none of the evidence regarding Ingraham's alleged discriminatory

24   animus is direct.  The comments made at the arbitration hearing do

25   not directly suggest, absent inference or presumption, that

26   Ingraham targeted plaintiff because of his age.  They could easily

27   refer to the changes at the company, particularly the transition

28   from analog to digital communication, and to plaintiff's years of

23 - FINDINGS & RECOMMENDATION

service and thus, the need to lead by example.

The other comments similarly require an inference to conclude that they are discriminatory, and thus, cannot be considered direct evidence of discrimination. Statements such as "old man" and being the "old man of the crew" are ambiguous and subject to differing inferences and thus, do not prove the fact of discriminatory animus without inference. While the comments could be references to an employee's chronological age, they could also refer to employees with longer tenure or to those who cling to outdated ideas.

Second, as the comments are not direct evidence, they must be specific and substantial for plaintiff to meet his burden of showing pretext by circumstantial evidence. Notably, none of the "old man" type comments may be described as having been made in the context of the termination decision. This has been an important factor in previous Ninth Circuit cases.

In Nidds, an elevator service mechanic was laid off from his job. Sometime in the year before his layoff, the district supervisor had allegedly told another mechanic that he intended to get rid of all the "old timers" because they would not "kiss my ass." Nidds, 113 F.3d at 915. The court rejected the plaintiff's argument that the "old timers" comment was sufficient to show pretext. Id. at 917, 918-19. The court stated: "[the supervisor's] comment was ambiguous because it could refer as well to longtime employees or to employees who failed to follow directions as to employees over 40." Id. at 919. The court continued: "Moreover, the comment was not tied directly to [the plaintiff's] layoff." Id.

The court compared the comment to one made in Nesbit v.

24 - FINDINGS & RECOMMENDATION

Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993).  There, the plaintiff's immediate supervisor had commented to the plaintiff that "we don't necessarily like grey hair."  The Nesbit court found that the "comment was uttered in an ambivalent manner and was not tied directly to [the plaintiff's] termination."  Nesbit, 994 F.2d at 705.

In a more recent case, the Ninth Circuit held that a comment by the employer that it was looking for someone "young and promotable" was insufficient to raise a question of fact as to whether the reasons articulated for laying the plaintiff off were pretexts for age discrimination.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 184-85 (9th Cir. 2000).

In Nidds, Nesbit, and Coleman, the court affirmed a grant of summary judgment to the employer.  Based on these cases, I conclude that plaintiff fails to show that the evidence is specific and substantial given that it consists of stray remarks, made one year before the termination decision, which are ambiguous and unconnected to the termination decision.  Even if the statements made post-termination at the arbitration hearing are as part of the termination decision, they are not specific and substantial enough to be considered circumstantial evidence of pretext.[6]

---

[6] There is also an allegation that Matney referred to plaintiff as "slow."  Pltf's Affid. at ¶ 32.  Matney was a prior supervisor of plaintiff's.  However, the remark occurred in March 2003, a time when Matney was not plaintiff's supervisor.  I do not find the evidence worthy of discussion because there is no evidence that Matney had any role in the termination decision and the comment was not made when he was plaintiff's supervisor. Even if it considered the comment along with the other evidence, however, I would not change my conclusion because again, it is not direct evidence as it could just as easily be a comment

1        C.  Failure to Provide Complete Info to Ayabe

2        Ayabe was the human resources employee whom Galey consulted

3   regarding the termination decision to see if it comported with the

4   union contract's just cause standard.  Ayabe also appears to have

5   represented defendant in the union grievance arbitration, or at

6   least provided defendant's written statement to the arbitrator.

7        Plaintiff makes an issue of the fact that at the time Galey

8   sought Ayabe's opinion regarding the just cause provision, Ayabe

9   apparently did not have certain information about plaintiff

10  including his August 2002 performance evaluation, and an April 3,

11  2003 letter from Randy Hagedorn congratulating plaintiff on twenty

12  five years of service.  Exh. 9 to Bond Oct. 23, 2006 Declr.

13       One other document Ayabe apparently did not review in

14  connection with her pre-termination advice about the just cause

15  provision was an August 13, 2003 <u>post-termination</u> document entitled

16  "Release of Records."  Exh. 15 to Bond Oct. 23, 2006 Declr.  This

17  appears to have been generated by plaintiff's union and is a

18  request, signed by plaintiff, for a copy of all of his employment

19  records.   Unidentified handwriting on the letter asks if the

20  records provided are "to include pager records and cell phone

21  records?"  <u>Id.</u>  Galey's handwritten response, dated August 13,

22  2003, states "pager records and phone records not available and not

23  applicable to this grievance or Rick's termination."  <u>Id.</u>

24       It is undisputed that Ayabe's role was to evaluate whether

25  Galey's proposed termination met the just cause standard of the

26  _____

27  directed to plaintiff's pace of work as it could his age, and it
    does not meet the specific and substantial standard, even
28  considered cumulatively with the other comments.

26 - FINDINGS & RECOMMENDATION

collective bargaining agreement.  This litigation is not an appeal
of that process.  The only relevance that process has to this
litigation is in raising the bar for plaintiff to show pretext, as
noted above.  But, as explained in footnote four, I am not holding
plaintiff to that higher standard and thus, any information Ayabe
might have had to inform her decision that the termination would be
sustained in a union arbitration proceeding, has no bearing in this
litigation.  The fact that Ayabe did not have the information does
not create an issue of pretext.

        D.  Adequate Training & Equipment

        Plaintiff contends that evidence of disparate treatment is
seen by the fact that he did not receive the same equipment or
training as other employees.  As I understand plaintiff's argument,
he states that with proper equipment and training there would have
been no 911 outage at Seaside on June 27, 2003, and he could have
continued working longer at the Seaside job site.  As to the second
point, I understand plaintiff's reasoning to be that if he had
proper equipment and training, he would have finished his work on
June 27, 2003 earlier in the day and thus could have set up some
"aerial work" to complete his shift and would not have returned to
Astoria.  Instead, he finished his work and then took lunch and in
his opinion, it was too late in the day to begin an "aerial"
project and thus, he drove back to Astoria.

        The training he alleges he should have received is cable
splicing school in advanced circuits which plaintiff contends was
provided to his younger co-workers.  But, the undisputed evidence
is that his need for such training was noted in his August 2002
performance evaluation, he was scheduled for it earlier in 2003,

27 - FINDINGS & RECOMMENDATION

but his own vacation plans prevented him from attending, and he was rescheduled to take in on June 30, 2003. It was then canceled in light of the events of June 27, 2003. Plaintiff fails to establish that his age had anything to do with his failure to receive the training.

The equipment he contends was received by younger co-workers is a 965 DSP digital meter and a bucket truck. However, even accepting that plaintiff did not receive this equipment when younger co-workers did, the argument misses the mark.[7]

The problem with the argument is that even if the lack of specified equipment and training hampered plaintiff in the performance of his job on June 27, 2003, as he alleges, defendant does not contend that plaintiff's actual performance of his technical job duties on that date triggered his termination. Rather, it was his decision to engage in personal errands and be out of communication, followed by his claiming nine hours of work time for the day, that defendant puts forth as the basis for its decision. Thus, plaintiff's argument that if he had had proper

---

[7] Defendant argues that plaintiff cannot base his discrimination claim on any act of defendant's occurring before July 27, 2003, because that is one year before the date he filed his BOLI claim. O.R.S. 659A.820, 659A.885. I do not view the alleged training and equipment issues as independent, new claims, but rather as background information relevant to determine pretext. Thus, I do not agree with defendant that the equipment and training issue is irrelevant to plaintiff's claim and I see no reason to reject those allegations as time barred because they are not being used as independent, separate claims. See RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1062 (9th Cir. 2002) (even if acts outside the limitations period are time barred and not actionable in and of themselves, "untimely claims serve as relevant background evidence to put the timely claims in context.") (internal quotation omitted).

28 - FINDINGS & RECOMMENDATION

equipment and training, which he contends was denied to him because of his age, the 911 outage would not have occurred or he would not have driven to Astoria, simply has no place in this pretext discussion because the focus of defendant's termination decision was not the outage, but rather was the fact that he engaged in personal business while on duty and claimed nine hours of time for the day.

Plaintiff's better argument is simply that defendant's intentional discrimination is seen by the bare fact of not providing the same equipment and training to plaintiff as it did to its younger workers. While this argument is more on point to the relevant issue, it still does not establish pretext on this record.

Plaintiff admitted in deposition that he was comfortable on the ladder and had never asked for a bucket truck while employed. Culver Depo. at p. 120-21. As to the 965 digital meter, plaintiff admitted that he did not need that meter before the June 2003 work he was doing on the 911 circuit in Seaside and he further admitted that he did not communicate on June 27, 2003, that he needed the 965 DSP meter to adequately perform the "half tap removals." Culver Depo. at p. 264. He did not ask for one because he had been successful in doing the job with the older piece of equipment. Id. at pp. 264-65. Provision of different, but adequate equipment, is not specific and substantial evidence of pretext.

E. Timesheet

Plaintiff makes several statements in his memorandum in opposition to the motion, suggesting that he contests the underlying facts leading to his termination. For example, he indicates that he was not actually out of route on June 27, 2003,

29 - FINDINGS & RECOMMENDATION

1  when he left Seaside and drove to Astoria.  Pltf's Mem. at p. 17.

2  The law is clear, however, that "[i]n judging whether [the

3  employer's] proffered justifications were 'false,' it is not

4  important whether they were objectively false (e.g., whether [the

5  plaintiff] actually lied).  Rather, courts only require that an

6  employer honestly believed its reason for its actions, even if its

7  reason is foolish or trivial or even baseless." Villiarimo, 281

8  F.3d at 1063 (internal quotation omitted); Smith, 2006 WL 733467,

9  at *4-5 (noting that "[e]ven assuming that plaintiff is correct

10 that he did not steal the packages, he still must show that

11 defendant's conclusion that he stole the packages was unreasonable

12 or false at the time the decision was made."); see also Young v.

13 Dillon Companies, Inc., 468 F.3d 1243, 1250 (10th Cir. 2006) ("the

14 relevant 'falsity' inquiry is whether the employer's stated reasons

15 were held in good faith at the time of the discharge, even if they

16 later prove to be untrue, or whether plaintiff can show that the

17 employer's explanation was so weak, implausible, inconsistent or

18 incoherent that a reasonable fact finder could conclude that it was

19 not an honestly held belief but rather was subterfuge for

20 discrimination"); Kariotis v. Navistar Int'l Transp. Corp., 131

21 F.3d 672, 677 (7th Cir. 1997) ("[A]rguing about the accuracy of the

22 employer's assessment is a distraction . . . because the question

23 is not whether the employer's reasons for a decision are right but

24 whether the employer's description of its reasons is honest")

25 (internal quotation, citation, and emphasis omitted); Jones v.

26 Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear

27 that even if a[n] [employee] did not in fact commit the violation

28 with which he is charged, an employer successfully rebuts any *prima*

30 - FINDINGS & RECOMMENDATION

1  *facie* case of disparate treatment by showing that it honestly
2  believed the employee committed the violation").

3       Plaintiff fails to create an issue of fact as to whether at
4  the time defendant discharged plaintiff, it did not hold an honest
5  belief that plaintiff had inappropriately left Seaside on June 27,
6  2003, had engaged in personal business in Astoria, and then caused
7  erroneous information to be put on his timesheet for that date.

8       F.  Other Employee Comparators

9       In the briefing on the summary judgment motion, plaintiff
10  suggests that co-worker Rich Rasumussen engaged in similar conduct
11  of picking up his paycheck at the Astoria Central Office, including
12  on occasion on company time, without admonishment or discipline.
13  Exh. 38 to Bond Oct. 26, 2006 Declr.  The problem with this
14  argument, however, is that first, Rasmussen is thirteen years older
15  than plaintiff and thus, cannot be used to show that younger
16  employees were treated more favorably.

17       Also, "[t]o identify a proper comparator, plaintiff must point
18  to individuals who have dealt with the same supervisor, have been
19  subject to the same standards, and engage in the same conduct
20  without any mitigating or distinguishing circumstances."  Smith,
21  2006 WL 733467, at *6 (internal quotation omitted).  Rasmussen was
22  in a different unit with a different supervisor.  Pltf's Mem. at p.
23  29.  Moreover, there is no evidence that he was on a warning of
24  dismissal when he picked up his paycheck at the Central Office, or
25  that he left a job site early to do so.

26       At oral argument, plaintiff disavowed his reliance on
27  Rasumussen as a comparator and indicated that he relied on
28  coworkers Mayfield and Rick Nunez to show that younger employees

31 - FINDINGS & RECOMMENDATION

were treated more favorably.  He stated that Mayfield received a bucket truck and a 956 digital meter.  As noted above, however, the fact that plaintiff received different, but adequate, equipment does not create an issue of pretext.

As to Nunez, I allowed plaintiff to submit a post-hearing memorandum citing to evidence in the record to show that Nunez was a valid comparator.  Plaintiff's post-hearing submission contains two references to Nunez in plaintiff's memorandum of law, which is not evidence.  The only evidence cited is a paragraph in plaintiff's affidavit which refers to the incident where Matney asked plaintiff why he was slow and in response, plaintiff explained that

> The work load had taken longer than normal, yes.
> However, the reason for taking longer was that I had
> provided "ojt" (on the job training) to Rick Nunez, a
> much younger, much less experienced construction unit co-
> worker.  Mr. Matney did not ask Mr. Nunez questions.

Pltf's Affid. at ¶ 32.

Nothing in this paragraph suggests that Nunez is a comparator to plaintiff for the purposes of creating pretext by showing that a similarly situated younger individual was treated differently by plaintiff.

Thus, I recommend that defendants' motion as to the age discrimination claim be granted because first, plaintiff fails to establish a prima facie case by failing to show that he was satisfactorily performing his job at the time of termination, or alternatively, because he fails to create an issue of fact as to pretext.

IV.  Workers' Compensation Retaliation Claim

To establish a prima facie case of workers' compensation

32 - FINDINGS & RECOMMENDATION

1   retaliation in violation of O.R.S. 659A.040, plaintiff must show:
2   (1)  that he invoked the workers' compensation system; (2) that he
3   was discriminated against in the tenure, terms, or conditions of
4   employment; and (3) that the employer discriminated against him in
5   the tenure or terms of employment because he invoked the workers'
6   compensation system.  <u>Kirkwood v. Western Hyway Oil Co.</u>, 204 Or.
7   App. 287, 293, 129 P.3d 726, 729 (2006).   The third element
8   requires a showing of a causal link between a workers' compensation
9   injury and a discriminatory act.  <u>Olson v. ASI Staffing, Inc.</u>, No.
10  CV-04-1086-MO, 2005 WL 1839015, *3 (D. Or. Aug. 3, 2005).

11       It is undisputed that Galey had no knowledge of plaintiff's
12  workers' compensation claim.   Thus, plaintiff can sustain this
13  claim only if Ingraham is assumed to be a joint decision-maker.
14  Even with this assumption, however, I recommend that defendants'
15  motion be granted.

16       The only argument plaintiff has in support of a showing of
17  causation is one based on timing.   Timing alone can show causation.
18  <u>E.g.</u>, <u>Villiarimo</u>, 281 F.3d at 1065 ("causation can be inferred from
19  timing alone where adverse employment action follows on the heels
20  of protected activity").   Plaintiff notes that his workers'
21  compensation claim was filed on or about September 25, 2002, and
22  that he received a written warning of dismissal in early November
23  2002, only about five weeks later.

24       The problem with this argument is that the adverse employment
25  action at issue in the case is the termination, which occurred in
26  August 2003, just over ten months after the workers' compensation
27  claim.  Although there appears to be no Ninth Circuit case directly
28  on point for a ten-month period, in <u>Villiarimo</u>, where the court

33 - FINDINGS & RECOMMENDATION

rejected the plaintiff's argument that an eighteen-month period between the protected activity and the termination established causation, the court favorably cited cases holding that one year, eight months, eight months, five months, and four months were too long to support an inference of causation. Id. (citing cases from the Seventh and Tenth Circuits). I conclude that a ten-month period of time, by itself, does not create an issue of fact regarding causation.

V.   Motion to Amend

After the conclusion of briefing on the motion for summary judgment, but before the oral argument on the motion, plaintiff moved for leave to file a second amended complaint in which plaintiff seeks to add a claim for punitive damages. At oral argument, I granted defendants' request to delay responding to the motion until after a ruling on the summary judgment motion. In light of my recommendation that the summary judgment motion be granted, I also recommend denying plaintiff's motion to amend as moot.

CONCLUSION

I recommend granting defendants' motion for summary judgment (#52). I recommend denying plaintiff's motion to amend (#66) as moot.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due March 1, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due

34 - FINDINGS & RECOMMENDATION

March 15, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __14th__ day of _February_____, 2007.


___/s/ Dennis James Hubel_____
Dennis James Hubel
United States Magistrate Judge

35 - FINDINGS & RECOMMENDATION